FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

2013 JUL 16 P 4: 06

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

CRISTINA FERNANDEZ CRUZ
   c/o Gibson, Dunn & Crutcher LLP
   1050 Connecticut Avenue N.W.
   Washington, DC 20036-5306

              Plaintiff,

     v.

NILDA J. MAYPA
   6528 Koziara Drive
   Burke, VA 22015

MICHELLE BARBA
(AKA MICHELLE MAYPA)
   12190 Henderson Road
   Clifton, VA 20124

FERDINAND BARBA
   12190 Henderson Road
   Clifton, VA 20124

              Defendants.

Civil Action No. 1:13 CV 862
            CMH /IDD

COMPLAINT FOR, INTER ALIA,
HUMAN TRAFFICKING AND
FORCED LABOR IN VIOLATION OF
THE VICTIMS OF TRAFFICKING
AND VIOLENCE PROTECTION ACT
OF 2000

JURY TRIAL DEMANDED

Cristina Fernandez Cruz, by and through her undersigned counsel, alleges as follows:

## INTRODUCTION

1.     Defendants Nilda J. Maypa, Michelle Barba, and Ferdinand Barba (collectively "Defendants") trafficked Cristina Cruz from her native Philippines to the United States for involuntary servitude and forced labor as a domestic servant in their homes. Defendants subjected Ms. Cruz to inhumane working and living conditions for a nearly six-year period.

2.     Through her former employment with the World Bank in Washington D.C., Ms. Maypa was able to secure special G-5 visas into the United States for her "personal employees,

attendants, and servants." Upon information and belief, Ms. Maypa abused this privilege on at least two occasions by using the G-5 visa as a means to facilitate human trafficking.

3.      Ms. Cruz, who was just 29 years-old when she was brought to the United States, is the primary provider for her young daughter and elderly parents in the Philippines. Her daughter suffers from a severe, life threatening form of asthma that requires medication and occasional hospitalization. Her father has survived two heart attacks, including one while Ms. Cruz remained in Defendants' homes, and he requires ongoing medical care and medication. Additionally, Ms. Cruz's father developed kidney failure and now requires constant dialysis. Ms. Cruz's family lacks adequate health insurance and her income is the only means to fully cover her family's substantial medical expenses.

4.      As the financial burden of supporting her family mounted, Ms. Cruz received a life changing opportunity. Ms. Maypa contacted Ms. Cruz about a lucrative employment offer to be her domestic helper in the United States—a position that included a substantial hourly wage, sick days, at least one day per week off, and travel expenses to visit her family biannually. Ms. Cruz readily accepted the offer.

5.      Yet, the reality of Ms. Cruz's new employment was far different. Defendants paid Ms. Cruz approximately 50 cents per hour, leaving her with little money for her family's medical needs. Defendants forced her to work around the clock; during her six-year ordeal, Ms. Cruz never had a single day off, even working through illness and injury. Defendants required Ms. Cruz to engage in arduous physical labor unsuited to her petite stature, including long, hot summer days spent tending to their properties and cold winter days spent shoveling snow.

6.      Defendants used a variety of means to compel Ms. Cruz's labor. Ms. Maypa seized her passport within hours of arriving into the United States and never returned it. Further Ms.

Maypa threatened Ms. Cruz that if she left them she would be hunted down, jailed, and deported by the police and thereby denied the ability to continue supporting her family. Ms. Cruz also never had the opportunity to leave Defendants' homes for personal reasons and fell into deep cultural and linguistic isolation. Even if she had left their homes, Defendants held Ms. Cruz in rural Virginia where she had no access to public transportation or other means of transportation.

7.      While subjecting Ms. Cruz to unconscionable living and working conditions, Defendants enjoyed a comfortable and luxurious lifestyle. Defendants had large homes on spacious lots, a wine cellar, a pool, and a luxury automobile. They took weekend trips to gamble in Atlantic City—sometimes bringing Ms. Cruz along to care for their children while they spent long nights inside a casino. Defendants also hosted large family events, during which Ms. Cruz was required to work as late as 2:00 a.m. caring for their guests and cleaning afterward.

8.      In 2008, Ms. Cruz engaged in a daring escape from Defendants. Since her escape, she has lived in fear that Defendants would find her and make good on the threats to have her deported. This fear has taken a physical and emotional toll on Ms. Cruz, who, even after escape, has lived in the shadows of society. Despite Defendants' promises, Ms. Cruz has been unable to visit with her ailing father or now-teenage daughter for more than a decade. Ms. Cruz now seeks justice and damages for the trafficking and other injuries that she suffered at the hands of Defendants for more than six years and which have continued to compound with the passage of time.

## BACKGROUND

9.      Ms. Cruz is a survivor of forced labor, involuntary servitude, and human trafficking, as defined by the Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), Pub. L.

No. 106-386, 114 Stat. 1464. Traffickers coerce their victims into performing labor through a variety of means, including through psychological abuse, threats, isolation, and confinement.

10.     According to the United States State Department's 2013 Trafficking in Persons Report, available at http://www.state.gov/j/tip/rls/tiprpt/2013/index.htm, the Philippines is a source country for men, women, and children subjected to forced labor:

> A significant number of Filipino men and women who migrate abroad for work are subsequently subjected to conditions of involuntary servitude. Men, women, and children are subjected to conditions of forced labor in factories, at construction sites, on fishing vessels, on agricultural plantations, and in the shipping industry, as well as in domestic service and other service sector jobs in Asia and increasingly throughout the Middle East. A significant number of Filipina women working in domestic service in foreign countries also face rape, physical violence, and sexual abuse.

11.     As far back as 2001, Human Rights Watch reported on the special vulnerabilities of domestic workers who come to the United States on special visas, including G-5 visas for domestic employees of international organization officials, finding that compared to undocumented workers, "ironically, their special visas exacerbate their vulnerability to abuse." The report found that many migrant domestic workers are hesitant to leave their employers or file complaints to enforce their rights, often due to their "cultural and social isolation—lack of knowledge of U.S. law, few local contacts and friends, and inability to communicate in English." The report concluded that "the special visa programs for domestic workers are conducive to and facilitate the violation of the workers' human rights" and, unfortunately, if a migrant worker does not assert her own rights, it is unlikely that they will otherwise be protected. Human Rights Watch, *Hidden in the Home: Abuse of Domestic Workers with Special Visas in the United States* (2001), *available at* http://www.hrw.org/reports/2001/usadom/usadom0501.pdf.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 because the action arises under U.S. law.  Supplemental subject matter jurisdiction exists

for Ms. Cruz's state-law claims pursuant to 28 U.S.C. § 1367.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants

reside in this District.

## THE PARTIES

14.     Cristina Fernandez Cruz is a citizen of the Philippines.  At the time of the events that

give rise to this Complaint, Ms. Cruz resided in Defendant Nilda Maypa's home in Burke,

Virginia and later in Defendants Michelle and Ferdinand Barba's home in Clifton, Virginia.

15.     Upon information and belief, Defendant Nilda J. Maypa is a 64-year-old legal

permanent resident of the United States and citizen of the Philippines.  Ms. Maypa is the mother

of Defendant Michelle Barba and the mother-in-law of Defendant Ferdinand Barba.  At the time

of the events that give rise to this Complaint, Ms. Maypa was an employee of the World Bank

and resided in Burke, Virginia.

16.     Upon information and belief, Defendant Michelle Barba (aka Michelle Maypa) is the

daughter of Ms. Maypa and is married to Defendant Ferdinand Barba.  At the time of the events

that give rise to this Complaint, Ms. Barba resided with Defendants Nilda Maypa and Ferdinand

Barba in Burke, Virginia for a period of time before moving with Mr. Barba to Clifton, Virginia.

17.     Upon information and belief, Defendant Ferdinand Barba is married to Defendant

Michelle Barba.  At the time of the events that give rise to this Complaint, Mr. Barba resided

with Defendants Nilda Maypa and Michelle Barba in Burke, Virginia for a period of time before

moving with Ms. Barba to Clifton, Virginia.

18.     Upon information and belief, Defendants continue to reside in Virginia.

## ALLEGATIONS OF FACT

### A.     Defendants Trafficked Ms. Cruz to the United States from the Philippines

19.     Cristina Cruz was born in Guagua Pampanga, Philippines and, prior to being brought
to the United States by Defendants, resided there with her young daughter, father, mother, and
siblings.  Ms. Cruz speaks Tagalog and Kapanpagan, a regional dialect of Tagalog, as well as
limited English.  She does not speak Visayan, which Defendants speak.

20.     Ms. Cruz stopped attending high school after one year so that she could supplement
her family's income.  Ms. Cruz subsequently worked as a house-keeper in the Philippines for
thirteen years.

21.     After her daughter was born, Ms. Cruz initially remained at home to care for her
infant daughter; however, her family's financial needs later forced her to seek employment once
again.

22.     Ms. Cruz learned from a friend about the possibility of working in the United States
for Defendant Maypa, an employee of the World Bank.  Her friend told her that Ms. Maypa's
daughter was pregnant and she needed a babysitter for the new baby.  A few months later, her
friend came to Ms. Cruz's home to inquire again about whether she was interested in taking a job
in the United States.

23.     Ms. Cruz gave her résumé to her friend, and shortly thereafter, she told Ms. Cruz that
Ms. Maypa had hired her based on her application and the friend's recommendation.

24.     About one month later, Ms. Cruz had her first interaction with Ms. Maypa by
telephone.  Ms. Maypa explained that she had hired Ms. Cruz to work as a babysitter for her

grandchild. She also said that she would be sending a contract that Ms. Cruz would need to sign and the paperwork for her visa.

25.     Ms. Maypa faxed the contract, annexed hereto as Exhibit 1, which she had already signed on December 14, 2001, to Ms. Cruz. The two-year contract stated that Ms. Cruz would be employed as a domestic employee at Ms. Maypa's residence and would work between 35 and 40 hours per week at a wage of $6.50 per hour. It also provided that Ms. Cruz would have at least one full day off each week, accumulate two paid sick days annually, have access to heavily subsidized medical insurance, and receive paid round-trip travel from her native Philippines.

26.     Ms. Cruz was excited about the contract and the terms it provided, although she had never signed a contract before. Because the contract was only in English, she shared it with her family and neighbors, who were more educated and more fluent in English. After they translated the document and explained its terms, Ms. Cruz felt comfortable signing the contract. Everyone agreed that she was lucky to have this opportunity to support her daughter and ailing father.

27.     Before she signed the contract, Ms. Cruz spoke a second time with Ms. Maypa on the telephone. During this conversation, Ms. Maypa explained to Ms. Cruz that, despite having signed the contract guaranteeing $6.50 per hour, Ms. Cruz would instead be paid $250 per month because Defendants could not afford the contract wage. Ms. Cruz did not question this change because she still believed this wage and the promised working conditions were better than what she could obtain in the Philippines. At this time, Ms. Cruz did not know that United States law required a significantly higher minimum wage.

28.     During this phone call, Ms. Maypa did not discuss any of the other written contract terms. Ms. Cruz understood that all of the remaining terms would be followed.

29.     In this same conversation, Ms. Cruz asked about visiting her young daughter in the Philippines every two years and expressed the importance of such an agreement. Ms. Maypa assured her that visiting her daughter after two years would not be a problem. Ms. Cruz understood that Ms. Maypa would even pay for the travel. In light of her daughter's young age and persistent medical condition, Ms. Cruz would not have accepted the arrangement without this guarantee.

30.     Ms. Maypa told Ms. Cruz that she would obtain a visa for Ms. Cruz through her status as an employee of the World Bank and could renew this visa while Ms. Cruz was in the United States. Ms. Maypa said she would be arranging for an interview with the United States embassy in Manila and that Ms. Cruz should bring all of her paperwork to this meeting.

31.     With the arrangement to visit her daughter after two years agreed, Ms. Cruz signed the contract on or about January 17, 2002.

32.     Over the next several weeks, Ms. Maypa coordinated several meetings for Ms. Cruz at the United States embassy in Manila in order to secure her passport and visa. On each occasion, Ms. Maypa paid for her transportation to Manila and Ms. Cruz was accompanied by the friend who told her of the job. Edward Javier, Ms. Maypa's brother who resides in Manila, would also accompany them to the embassy. The meetings at the United States embassy focused primarily on completing the necessary paperwork, though Ms. Cruz was asked how she had been introduced to Ms. Maypa. On the third meeting, Ms. Cruz's paperwork was approved and she was told she would receive her visa in two weeks.

33.     After receiving her visa, Ms. Cruz coordinated with Mr. Javier on flight arrangements. She requested a short delay so she could spend a few more weeks with her

daughter and parents in the Philippines. On or around March 17, 2002, Ms. Cruz traveled to the United States. Upon information and belief, Defendants arranged and paid for this travel.

34.     Ms. Cruz had never left the Philippines nor had she flown prior to this trip. She did not know anyone living in Washington D.C. or Virginia.

35.     Ms. Maypa had promised to provide clothing for Ms. Cruz, so she brought only a few articles of clothing with her to the United States. In addition, she brought a few personal effects including photographs of her family. Ms. Cruz's luggage was filled mostly by heavy gifts that Mr. Javier instructed her to deliver to Defendants.

36.     Ms. Cruz landed in Virginia at Dulles International Airport. There she was met by Ms. Maypa and Ms. Barba who were joined by two of Ms. Barba's four children. Ms. Maypa and Ms. Barba transported Ms. Cruz to their shared residence in Burke, Virginia where she met the additional two Barba children.

**B.     Defendant Maypa Retained Ms. Cruz's Passport and Refused Her Request to Return It**

37.     Just hours after arriving in the United States and reaching Defendants' home, Ms. Maypa offered to hold Ms. Cruz's passport. Ms. Cruz surrendered her passport because she was unsure whether it was required and trusted that Ms. Maypa would handle any necessary immigration-related paperwork.

38.     Ms. Cruz never regained possession of her passport after surrendering it to Ms. Maypa. Ms. Cruz accidentally discovered the location of her passport while cleaning the home, but did not take it because she feared Ms. Maypa's response. After doubts arose about Ms. Maypa's representations that she would handle the necessary immigration-related paperwork, Ms. Cruz asked for the return of her passport. Ms. Maypa became angry and yelled at her. Ms.

Maypa refused to return the passport and, upon information and belief, told Ms. Barba about the request. Shortly after her request, Ms. Maypa and Ms. Barba spoke to one another in Visayan, which Ms. Cruz did not understand, and then Ms. Barba refused to speak to Ms. Cruz for several days. Following Ms. Cruz's first request, she never again saw her passport. She asked for the return of her passport a second time, and Ms. Maypa again became angry and yelled at her. Despite efforts to locate it before escaping from Defendants, Ms. Cruz could not find her passport.

39.     Year after year, Ms. Maypa promised Ms. Cruz that she would use her position with the World Bank to secure Ms. Cruz a renewed G-5 visa so that she could visit her daughter in the Philippines. Ms. Maypa did not follow through on this promise. She claimed that a series of ever-changing obstacles prevented her from renewing Ms. Cruz's visa. At one time, Ms. Maypa concocted an elaborate scheme to send Ms. Cruz to Canada to obtain the necessary immigration paperwork, but Ms. Maypa later abandoned the plan when she determined it would not work.

40.     Eventually, Ms. Maypa told Ms. Cruz that she could not renew her visa, news which devastated Ms. Cruz because she knew this meant she could not see her daughter. Instead, Ms. Barba offered to bring Ms. Cruz's daughter to the United States – a promise, like the rest, which went unfulfilled. Ms. Barba justified her broken promise by arguing that Ms. Cruz would not want her daughter to be exposed to Mr. Barba's temper and the fighting which occurred in the Barba household.

41.     Ms. Maypa told Ms. Cruz that, even without a renewed visa, Ms. Cruz would be "safe" if she remained with Defendants due to her contractual relationship with them and receipt of an I-94 admission form upon entering the United States. Because Ms. Cruz did not

understand the immigration requirements in the United States, she relied on Ms. Maypa's representations about her immigration status.

42.     Ms. Maypa exploited Ms. Cruz's lack of knowledge about immigration procedures in the United States to put her in extreme fear of the consequences if she attempted to escape from their homes.  At various times, Ms. Maypa told Ms. Cruz that she would be hunted down, jailed, and deported by the police and immigration officials if she attempted to leave them.  Ms. Cruz interpreted these threats to mean that Defendants would report her to the authorities if she ceased to provide them with her labor, but they would otherwise allow her to remain "safe."

43.     Defendants' strategic use of immigration procedures facilitated their psychological coercion of Ms. Cruz.  By allowing Ms. Cruz's visa to expire and falsely representing immigration requirements to her, Defendants created an environment of fear and uncertainty that trapped Ms. Cruz and allowed them to continuing receiving her forced labor.  Defendants knew that Ms. Cruz would continue to endure her inhumane working conditions to provide for the medical care of her young daughter and ailing father.  By shifting Ms. Cruz to an undocumented status, Defendants essentially ensured that she could not escape them.

C.      **Defendants Forced Ms. Cruz to Work Excessive Hours and Paid Her Meager Wages Despite Their Promises**

44.     Shortly after arriving in the United States, Ms. Cruz learned that her working and living conditions had been drastically misrepresented.  Ms. Maypa's actions made clear that she did not intend to follow the original contract terms that had made this opportunity especially attractive to Ms. Cruz.

45.     Over the years, Ms. Maypa also drafted and signed two additional contracts, each offering increasingly generous terms; she did not abide by their terms either.  Ms. Maypa

executed the first contract extension on January 3, 2004, which is annexed hereto as Exhibit 2. This fifteen-month contract provided Ms. Cruz with a higher wage of $6.72 per hour and fully paid medical insurance. Ms. Maypa and Ms. Cruz executed a second contract extension on February 22, 2005, in both English and Tagalog, further enhancing Ms. Cruz's promised working conditions and benefits. Both versions of this contract are attached hereto as Exhibits 3 and 4. This three-year contract offered 35-hour work weeks, weekends off, paid holidays, and three weeks of unpaid vacation. Ms. Maypa never honored the provisions in either contract.

46.     Rather than working 7–8 hours per day as promised, Ms. Cruz typically worked 17–18 hours and was expected to remain on-call during the night. Ms. Cruz typically began her day by 5:30 a.m., as she was required to wake the Barba's school-aged children and prepare them for school, and worked tirelessly until at least 10:00 p.m., and occasionally much later. Instead of the expected six-day work weeks, Ms. Cruz maintained this schedule seven days per week. Ms. Cruz was never allowed to take off a single day throughout her nearly six-year ordeal, including holidays or when she was ill.

47.     Defendants demanded that Ms. Cruz engage in labor well beyond the scope of anything discussed prior to her employment or in her contracts. When Ms. Cruz first arrived in Virginia, the Barba family of six and Ms. Maypa's adult son, Delson Maypa, all lived in Ms. Maypa's home in Burke, Virginia. Ms. Cruz was expected to cook for this entire eight-person family and to launder their clothing. Additionally, Defendants required Ms. Cruz to maintain Ms. Maypa's four-bedroom, three-and-a-half-bathroom home.

48.     Approximately one year after Ms. Cruz arrived in the United States, Mr. and Ms. Barba bought a separate home in Clifton, Virginia. This new home had four bedrooms and three bathrooms, a sunroom, a deck, a pool, and a wine cellar. Defendants told Ms. Cruz that she

would be relocated to the Barba's new home to focus her labor on the needs of their larger family. However, this would be in addition to continuing to maintain Ms. Maypa's home. Defendants transported Ms. Cruz back and forth to Burke, Virginia one day per week so that she could accomplish this task.

49.     Many of Ms. Cruz's assigned duties were arduous and wholly inappropriate for a woman of her petite build. For example, Defendants required Ms. Cruz to spend the daylight hours on weekends tending to their sizable properties—including mowing the lawns, trimming trees, removing snow, cleaning the pool, and other landscaping activities; during the long, hot summer days, Ms. Cruz sometimes spent hours toiling in the yard.

50.     Ms. Cruz was further expected to provide 24-hour care for all four of the Barba's children, despite being told earlier that she would provide daycare for a single child. Even while she slept, the children would awaken Ms. Cruz to comfort them following a nightmare or during a late-night illness.

51.     Defendants forced Ms. Cruz to take Ms. Barba's youngest child to an orientation session hosted by the World Bank to teach newly arrived domestic servants about their legal rights. The baby cried throughout the presentation forcing Ms. Cruz to focus only on quieting the child and eventually to leave early.

52.     Ms. Cruz was expected to care for the Barba's children when Mr. and Ms. Barba were out of town—often times for weekend trips to gamble in Atlantic City. During these trips, Ms. Cruz was sometimes left at home to care for all four children without support. On other occasions, Ms. Cruz was transported to other states to care for the Barba's children during their vacations. During one notable trip to Atlantic City during the midst of winter, Ms. Cruz was left

to care for the shivering children outside a casino that did not allow minors while Mr. and Ms.

Barba gambled inside for several hours; they did not emerge until after midnight.

53.     Ms. Maypa also required that Ms. Cruz occasionally walk their dog. Ms. Cruz was

afraid of this dog because it was aggressive toward humans and other animals. When walking

the dog along the route designated by Ms. Maypa, Ms. Cruz would repeatedly cross the street to

avoid other pedestrians or animals because she feared that she would be unable to control the dog

if it lunged at them.

54.     Defendants gave Ms. Cruz a pittance for her endless hours of hard labor. At first,

Defendants paid Ms. Cruz just $250 per month—or slightly more than $8 per day. Based on a

17-hour work day—a duration that Ms. Cruz commonly exceeded— this amounts to less than 50

cents per hour. Each year, Defendants increased Ms. Cruz's meager monthly wages by $50.

Therefore, when she escaped, Ms. Cruz was being paid just $450 per month—around $15 per

day or less than 90 cents per hour. Ms. Cruz was unaware that Defendants paid her a small

fraction of the minimum wage required under federal and state law because Defendants did not

provide her with, or display in their residences, any information about these requirements.

55.     Ms. Maypa paid Ms. Cruz's meager wages in cash; upon information and belief, Ms.

Barba provided some or all of the cash to Ms. Maypa on some occasions. Sometimes Ms.

Maypa demanded that Ms. Cruz complete false documents in conjunction with these payments,

although Ms. Cruz was never provided with a copy of these documents. For example, at various

times, Ms. Maypa required Ms. Cruz to fill out timesheets indicating that she worked a much

lesser number of hours each week. Further, Ms. Maypa required Ms. Cruz to endorse

"paychecks," although the checks were never given to or used for the benefit of Ms. Cruz. Ms.

Cruz did not understand what these false documents were, but Ms. Maypa described them as a "formality" that were necessary to keep Ms. Cruz "safe."

### D.    Living Conditions and Medical Care

56.    Defendants humiliated Ms. Cruz and forced her to live without any modicum of personal privacy. Despite owning two large homes, Defendants required Ms. Cruz to sleep on a couch in the living room for nearly six years. In both homes, the family television was in the living room, making it impossible for Ms. Cruz to begin or continue sleeping when any member of the family wanted to watch television. Ms. Cruz had neither private space to store personal items and toiletries, nor a private room in which to dress or enjoy solitude. At Ms. Maypa's home, Ms. Cruz was forced to store her few personal possessions, including the photograph of her family, in a bag next to the couch.

57.    Defendants rarely allowed Ms. Cruz to indulge in a moment of personal time. For example, Ms. Maypa did not allow Ms. Cruz to have access to, or time to enjoy, television programming, literature, or music of her choosing.

58.    Defendants never sought to accommodate Ms. Cruz's preferences for food or personal items; she was instead expected to eat whatever food or use whatever personal hygiene products were made available.

59.    Defendants failed to provide Ms. Cruz appropriate clothing despite their promises to do so. Ms. Cruz brought few items of clothing with her from the Philippines because Ms. Maypa promised to furnish her with what she needed. Instead, Defendants initially provided Ms. Cruz with only two pairs of used pajamas and a sweater.

60.    Ms. Cruz did not have access to the appropriate cold-weather and protective gear for her assigned duties. For instance, when Ms. Cruz was required to mow Defendants' yards and

provide other landscaping services, she typically wore only pajamas. Similarly, when Ms. Cruz worked outside during the cold winter months—or even in the snow—she lacked warm, dry shoes, and she had to stop working occasionally when her toes became painfully cold. She did not have a winter coat and had to borrow the children's gloves as she did not have any of her own.

61. Ms. Cruz lived in constant fear of Mr. Barba's outbursts toward her and the Barba's children. Mr. and Ms. Barba had a volatile relationship that was punctuated by frequent, loud arguments. When Mr. Barba became angry during these altercations, he was prone to episodes of rage—often slamming doors or walls and stomping loudly around the house. On one occasion, Mr. Barba broke a bed frame during a violent outburst and Ms. Cruz feared that he was going to hit his daughter. On another occasion, Mr. Barba became angry and yelled at Ms. Cruz when she sought permission for his sister to bring her children to the Barba's house for a few days so that Ms. Cruz could watch them at the same time as the Barba's children and earn needed supplemental income. These events caused Ms. Cruz to fear that she or the children might become a target of Mr. Barba's unpredictable anger at any moment.

62. Defendants also failed to provide Ms. Cruz with access to basic medical and dental care. Defendants' unwillingness to provide her with regular healthcare resulted in painful, long-term medical issues and untreated illnesses. For example, at one point Ms. Cruz had a tooth infection and asked if she could see a dentist. Instead of taking her to a dentist, Ms. Barba simply brought Ms. Cruz medicine to numb the pain. As a result, after she escaped, Ms. Cruz had to have that tooth extracted, a painful and complicated process due to the extent of the decay. When Ms. Cruz became ill, Defendants denied her the opportunity to visit a doctor and Ms. Barba—who works in the medical profession—would simply bring home prescription drugs and

instruct Ms. Cruz to take them. During her nearly six years with Defendants, Ms. Cruz also had no opportunity to receive preventive care or medical screenings.

63.     On only one occasion did Ms. Cruz receive medical attention. When she was inadvertently kicked in the jaw by one of Ms. Barba's children and the injury rendered her unable to open her mouth, Ms. Barba took Ms. Cruz to a doctor with whom she worked. However, Ms. Cruz received only a cursory examination and was chastised by Ms. Barba for requesting medical care for her injury.

### E.     Defendants Isolate Ms. Cruz in their Rural Virginia Home

64.     Defendants isolated Ms. Cruz from her family, friends, culture, and local community. Ms. Cruz did not know how to use a telephone in the United States. Instead, she was dependent on Defendants to assist her when she called home to the Philippines to check on the health of her father and to speak with her daughter. Because Defendants would not pay for her phone calls, this occurred only when Ms. Cruz could afford a prepaid phone card for a short conversation.

65.     When Ms. Cruz called home to the Philippines, she could not freely discuss her plight in the United States because Ms. Barba, and possibly other Defendants, occasionally monitored her phone conversations. Ms. Cruz believes Defendants monitored her conversations to ensure that she was not reporting her working and living conditions to others. Further, upon information and belief, Defendants sometimes lied to callers for Ms. Cruz by saying she was not available to talk. Defendants also did not provide Ms. Cruz with access to a cell phone or the Internet—neither of which she had the opportunity or resources to purchase without Defendants' assistance.

66.     Ms. Cruz missed numerous opportunities to console, grieve, and celebrate with her family because of Defendants' actions. While Ms. Cruz remained in Defendants' homes, she

could not travel home when her young daughter and father suffered life threatening health events. Further, despite her requests to Defendants, Ms. Cruz was prevented from returning home for the funerals of her grandmother or great-grandparents. Ms. Cruz also missed the births of numerous nieces and nephews, whom she has still never met.

67.     Ms. Cruz did not know anyone in Virginia and never had the opportunity to meet new friends or to become integrated into the community after arriving in the United States. Defendants caused this social isolation by preventing her from leaving their homes for any personal reason. Further, throughout her nearly six-year ordeal, Ms. Cruz never left the home unaccompanied except to walk Ms. Maypa's dog.

68.     Even if Ms. Cruz had been allowed to leave Defendants' homes alone, she was kept in a rural area of Virginia without means of travel. For example, Mr. and Ms. Barba's home was approximately six miles from the nearest grocery store. Both homes are in areas which lack any form of public transportation, and Ms. Cruz has never driven a vehicle, nor did she have access to one. In addition, the roads surrounding the Barba's home lack sidewalks, making them dangerous to navigate on foot. Without transportation assistance from Defendants, Ms. Cruz was effectively trapped in their homes.

69.     Ms. Cruz's isolation further deprived her of access to her Filipino culture and language. She did not have regular access to literature, television programming, or radio in her native language. She was unable to keep apprised of the current events in her home country. Because she had no opportunity to socialize outside Defendants' homes, Ms. Cruz never met others with whom she could converse in her native dialect.

**F.    Ms. Cruz Escaped Defendants' House**

70.    In late 2007, Ms. Cruz began thinking about running away.  She was terrified of

leaving Defendants' homes because of the things Ms. Maypa had told her about the police and

because she did not know anyone in Virginia.  However, the fear of being stuck with Defendants

living in these conditions for the rest of her life was greater.  Ms. Cruz made contact with a

friend who she learned was living in the United States who gave her the contact information for

someone who could help her escape.

71.    On or about January 17, 2008, with the help of her friend, Ms. Cruz escaped Mr. and

Ms. Barba's home.  Before she left, Ms. Cruz gathered all of the papers she could find that

related to her employment and immigration status.  On the pre-arranged day, when there were no

cars in the driveway, a van pulled up to the side of the Barba's house and gave a signal to Ms.

Cruz.  She ran from the home.

**G.    Prolonged Emotional and Psychological Harm Suffered by Ms. Cruz**

72.    Ms. Cruz has suffered from depression and anxiety as a result of her human

trafficking experience.  Among the most profound impacts for Ms. Cruz has been missing her

daughter's childhood.  Since escaping, Ms. Cruz has also had difficulty sleeping due to the stress

caused by Defendants' threats that the police would find and arrest her.  She also constantly

doubts her own self-worth as a result of Defendants' scheme to degrade her and keep her under

their control.

73.    Ms. Cruz has received medical care for high blood pressure and back pain that are

both attributed to stress from her human trafficking experience.  She also now takes prescription

medications for several medical conditions, including asthma, allergies, and gastroesophageal

reflux disease—all of which developed only after being brought to the United States by Defendants.

74.     Ms. Cruz continues to experience emotional and psychological pain because of Defendants' offenses.

## CLAIMS FOR RELIEF

### COUNT I

**(Forced Labor in Violation of the Victims of Trafficking and Violence Protection Act of 2000 ("TVPA"), 18 U.S.C. §§ 1589, 1595)**

**(Against All Defendants)**

75.     Ms. Cruz re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

76.     As enacted prior to December 22, 2008, 18 U.S.C. § 1589 made it unlawful to "knowingly provid[e] or obtain[] the labor or services of a person…(1) by threats of serious harm to, or physical restraint against, that person or another person; (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or (3) by means of the abuse or threatened abuse of law or the legal process."

77.     As alleged herein, Defendants knowingly provided or obtained Ms. Cruz's labor in violation of the forced labor provisions of 18 U.S.C. § 1589 through (i) threats of serious harm, including psychological, financial, or reputational harm, against Ms. Cruz and her family; (ii) threats of physical restraint to Ms. Cruz through retention of her passport, threats of forced deportation, and other affirmative acts; (iii) a scheme, plan, or pattern intended to cause Ms. Cruz to believe that if she did not perform labor for Defendants, she or her family would suffer

serious harm or physical restraint; and (iv) abuse or threatened abuse of law or legal process by repeatedly telling Ms. Cruz that she would be jailed and deported if she ceased to provide her labor to Defendants.

78.     Ms. Cruz brings this claim for relief pursuant to 18 U.S.C. § 1595.

79.     As a direct and proximate result of Defendants' actions, Ms. Cruz has suffered damages in an amount to be established at trial.

80.     Ms. Cruz is entitled to recover damages to account for the full value of her losses, including, but not limited to, emotional distress, lost wages, punitive damages, and other losses suffered by Ms. Cruz as a proximate result of Defendant's conduct, along with reasonable attorneys' fees incurred in this action.

## COUNT II

**(Trafficking with Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor in Violation of the TVPA, 18 U.S.C. §§ 1590, 1595)**

**(Against All Defendants)**

81.     Ms. Cruz re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

82.     As enacted prior to December 22, 2008, 18 U.S.C. § 1590 made it unlawful to "recruit[], harbor[], transport[], provide[], or obtain[] by any means, any person for labor or services in violation of [the sections included in Title 18, Part I, Chapter 77]."

83.     As alleged herein, Defendants knowingly harbored, transported, provided for, and obtained Ms. Cruz for labor in violation, or attempted violation, of numerous provisions of Chapter 77, including 18 U.S.C. §§ 1584, 1589, 1592(a). Further, Defendant Maypa recruited Ms. Cruz to obtain her labor in violation, or attempted violation, of numerous provisions of Chapter 77, including 18 U.S.C. §§ 1584, 1589, 1592(a).

84.     Ms. Cruz brings this claim for relief pursuant to 18 U.S.C. § 1595.

85.     As a direct and proximate result of Defendants' actions, Ms. Cruz has suffered damages in an amount to be established at trial.

86.     Ms. Cruz is entitled to recover damages to account for the full value of her losses, including but not limited to, emotional distress, lost wages, punitive damages, and other losses suffered by Ms. Cruz as a proximate result of Defendant's conduct, along with reasonable attorneys' fees incurred in this action.

## COUNT III

**(Failure to Pay Federal Minimum Wage in Violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 216)**

**(Against All Defendants)**

87.     Ms. Cruz re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

88.     29 U.S.C. § 206 establishes the right of all persons who are employed to be paid a minimum wage for all hours worked, including employees in domestic service.

89.     At all relevant times, Ms. Maypa and Mr. and Ms. Barba acted jointly as Ms. Cruz's employer and Ms. Cruz was their employee, performing labor and services as a domestic worker, within the meaning of 29 U.S.C. §§ 203(d)-(e) & 206(f).

90.     Defendants failed to pay Ms. Cruz statutory minimum wages, in violation of 29 U.S.C. § 206(a) and regulations of the United States Department of Labor.

91.     Defendants' failure to pay Ms. Cruz the required wage was willful. Defendants acted knowingly, willfully, or with reckless disregard that their conduct was prohibited as evidenced

by Ms. Maypa submitting a fraudulent contract to obtain a visa for Ms. Cruz to enter the United States.

92.     29 C.F.R. § 516.4 requires employees subject to the federal minimum wage laws to post notices concerning minimum wage.

93.     At no time did Defendants post the requisite notice.

94.     Ms. Cruz brings this claim for relief pursuance to 29 U.S.C. § 216(b).

95.     Defendants' willful violation of the FLSA entitles Ms. Cruz to recovery of her unpaid minimum wages since her arrival in the United States, an equal amount as liquidated damages, and reasonable attorneys' fees and costs of the action pursuant to 29 U.S.C. §§ 201 *et seq.* and United States Department of Labor regulations, in addition to declaratory relief.

## <u>COUNT IV</u>

### (Breach of Contract)

### (Against Defendant Maypa)

96.     Ms. Cruz re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

97.     Defendant Maypa created legally enforceable obligations through the written contracts that she drafted and signed with Ms. Cruz.

98.     Defendant Maypa violated or breached these obligations by failing to honor the contracts' terms. The breach of these obligations caused injury or damage to Ms. Cruz.

99.     In order to satisfy the requirements of the World Bank for Ms. Cruz to receive a G-5 visa, Defendant Maypa created and executed a contract for Ms. Cruz to work in the United States in or around December 2001. This contract provided for 40 hours per week at an hourly wage of $6.50, paid sick time, a minimum of one full day off per week, medical insurance, and roundtrip

travel to the United States. Defendant Maypa drafted and executed subsequent contracts in or around January 2004 and February 2005 which had similar provisions but increased the hourly wage to $6.72.   Further, the contracts described Ms. Cruz's duties as cleaning, cooking, laundry, and babysitting.

100.   Ms. Cruz fully performed under her contract with Defendant Maypa by working as a domestic servant in Defendants' Virginia residences.  Ms. Cruz actually performed beyond the contract terms by working far in excess of the stated hours and undertaking additional duties beyond those stated in the contracts.

101.   Defendant Maypa breached all of these contracts in several ways, including failing to pay Ms. Cruz the stated hourly wage, failing to compensate Ms. Cruz for hours worked beyond the contract terms, and refusing to provide Ms. Cruz with a single day off.

102.   As a direct and proximate result of Defendant Maypa's actions, Ms. Cruz has suffered injury or damages.

103.   Ms. Cruz is entitled to recover damages in an amount to be determined at trial, including attorney's fees and the cost of this action.

## COUNT V

### (Fraudulent Misrepresentation)

### (Against Defendant Maypa)

104.   Ms. Cruz re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

105.   Defendant Maypa made false representations of material fact, intentionally and knowingly to mislead Ms. Cruz, who relied on the false representations, and consequently, suffered damages.

106. Prior to coming to the United States and working in Defendants' Virginia residences, Defendant Maypa made false representations of material facts to Ms. Cruz, including, but not limited to, statements about her working conditions in the United States. Defendant Maypa reiterated these same false representations to the World Bank and the U.S. Embassy in the Philippines. Defendant Maypa also made repeated false representations about Ms. Cruz's opportunities for return travel to the Philippines to visit her young daughter and ailing father.

107. At the time that Defendant Maypa made these statements, she knew them to be false. Defendant Maypa never had any intention of carrying out the representations.

108. Defendant Maypa intentionally and knowingly made these statements for the purpose of misleading Ms. Cruz to believe that her working conditions in the United States would be better than in the Philippines and to obtain a G-5 visa to traffic Ms. Cruz into the United States and force her to work in Defendants' Virginia residences.

109. Ms. Cruz reasonably and justifiably relied on Defendant Maypa's representations and believed that she could earn more money to care for her family while having the freedom to return home to see her family periodically.

110. As a direct and proximate result, Ms. Cruz suffered damages during her forced labor as a domestic servant for Defendants, including the receipt of unlawfully low wages, the denial of her freedom and fundamental human rights, psychological abuse, and other economic and emotional harm.

111. Defendant Maypa committed these acts maliciously and oppressively, with the wrongful intention of causing harm to Ms. Cruz and in conscious disregard for her well-being.

112. Ms. Cruz is entitled to recover damages in an amount to be determined at trial, including punitive damages, attorneys' fees, and the cost of this action.

## COUNT VI

### (False Imprisonment)

### (Against All Defendants)

113.     Ms. Cruz re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

114.     Defendants intentionally restricted Ms. Cruz's freedom, movement, or physical liberty, confining her to their home, without legal right, through the use of force, words, or acts, which Ms. Cruz was afraid to ignore or to which she reasonably believed she must submit.

115.     Ms. Cruz was not free to leave Defendants' control.

116.     Specifically, Defendant Maypa seized Ms. Cruz's passport and threatened Ms. Cruz that she would be arrested and deported if she left Defendants' residences, while knowing that Ms. Cruz spoke limited English, had no access to public transportation, was unfamiliar with the area, and had very little money available to her.

117.     Ms. Cruz was unlawfully confined in Defendants' Virginia residences for nearly six years.  During this time, Ms. Cruz never left Defendants' residences without being accompanied.

118.     Because of Defendants' actions, Ms. Cruz was afraid to defy Defendants and reasonably believed that she had to submit and remain in their home.

119.     Defendants committed these acts maliciously, with the wrongful intention of causing harm to Ms. Cruz and in conscious disregard for her rights.

120.     As a direct and proximate result of Defendants' conduct, Ms. Cruz suffered damages, including emotional and psychological distress, pain and humiliation, economic injury from being deprived of the ability to go about her personal affairs, and other injuries.

121.    Ms. Cruz is entitled to recover damages in an amount to be determined at trial, including punitive damages, attorneys' fees, and the cost of this action.

## COUNT VII

### (Punitive Damages/Special Damages)

### (Against All Defendants)

122.    Ms. Cruz re-alleges and incorporates by reference each and every allegation contained in this Complaint as if fully set forth herein.

123.    Defendants' tortious conduct as alleged herein was undertaken deliberately and with actual malice, that is, with a sense of consciousness and deliberate wrongdoing, evil or wrongful motive, intent to injure ill will, or fraud.

124.    Defendants' conduct involved reckless or callous indifference to the federal and state-protected rights of Ms. Cruz. This conduct caused Ms. Cruz to suffer severe financial and emotional harm.

125.    Ms. Cruz is entitled to an award of punitive damages based upon Defendants' malicious conduct in an amount to be determined at trial.

## PRAYER FOR RELIEF

126.    Ms. Cruz demands judgment against all Defendants and respectfully requests that this Court grant the following relief, in amounts to be determined at trial, on each count detailed above:

a.      compensatory damages for each claim of relief;

b.      punitive damages;

c.      attorney's fees and costs; and

d.      such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

127. Ms. Cruz demands a jury trial on all issues so triable.

Respectfully submitted,

Dated: July 16, 2013

Joseph D. West
Virginia Bar No. 16834
*Attorney for Cristina F. Cruz*
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone:   202.955.8500
Facsimile:    202.467.0539
Email:          JWest@gibsondunn.com

William Jeremy Robison
Pro Hac Vice Admission Pending
*Attorney for Cristina F. Cruz*
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, DC 20036
Telephone:   202.955.8500
Facsimile:    202.467.0539
Email:          WRobison@gibsondunn.com

Dana Sussman
Pro Hac Vice Admission Pending
*Attorney for Cristina F. Cruz*
Safe Horizon
50 Court Street, 8th Floor
Brooklyn, NY 11201
Telephone:   718.943.8631
Facsimile:    718.943.8653
Email:          Dana.Sussman@safehorizon.org